UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HOLLY A. MANVILLE,

                              Plaintiff,

                                                      <u>DECISION AND ORDER</u>

                                                      09-CV-6221L

              v.

TOWN OF GREECE,
SERGEANT THOMAS SCHAMERHORN,

                              Defendants.
_____

       This action under 42 U.S.C. § 1983 arises out of an incident that occurred in June 2007, in

which plaintiff Holly A. Manville was arrested following a traffic stop by defendant Thomas

Schamerhorn, a sergeant in the Greece (New York) Police Department ("GPD").  In the present

posture of this case, plaintiff asserts a total of five claims against two defendants, Schamerhorn and

the Town of Greece ("Town").[1]  Defendants have separately moved for summary judgment on four

of those five claims.


                              **BACKGROUND**


       At around 12:30 in the morning of June 21, 2007, plaintiff was driving on Latta Road in

Greece when she was pulled over by Schamerhorn, who was on road patrol duty at the time.  To

understand what happened next requires some background, as this was not the first time that plaintiff

and Schamerhorn had crossed paths.

_____

       [1]Several additional claims have previously been dismissed, as explained in n.2, *infra*.

Plaintiff alleges–and for purposes of the present motions, defendants do not dispute–that during 2004, Schamerhorn pulled her over on three separate occasions. The first time, in the summer of 2004, he gave plaintiff a ticket for failing to stop at a red light. The second time, also during the summer, Schamerhorn informed plaintiff that either her inspection or registration was overdue, but he let her go with a warning. Manville Depo. Transcript ("Tr.") (Dkt. #34-4) at 29-30.

During the third of those stops, on October 24, 2004, Schamerhorn allegedly ordered plaintiff out of her vehicle, kicked her feet out from under her, forcefully cuffed her hands behind her back, and then pulled her up off the ground by the handcuffs. Manville Aff. (Dkt. #39-2) ¶¶ 7-10. Plaintiff testified at her deposition that Schamerhorn issued her tickets for "speeding and driving under the influence," Tr. at 47, that she was taken to the police station, Tr. at 49, and that she eventually pleaded guilty to a charge of driving while impaired. Tr. at 141-42.

Plaintiff also testified that the day after this incident, she told her father what had happened, and that he called the GPD to complain about Schamerhorn's actions. Plaintiff testified that her father told her that the person he spoke with said that plaintiff could come into the station and fill out a written complaint, and that she did so, about two days after the incident. Tr. at 58-59. She also testified, however, that she never heard anything more about that complaint, and that she did not retain a copy of it for herself. Tr. at 79-80.

Oddly, neither in the complaint in this action nor in her affidavit in opposition to defendants' motions does plaintiff make any mention of her having filed a written complaint about this incident; she states only that her father "complained to Sgt. Schamerhorn's supervisor for over two hours" about Schamerhorn's alleged use of excessive force. *See* Dkt. #23 ¶ 29, Dkt. #39-2 ¶ 12.

Plaintiff further testified that in the spring of 2007, she was again pulled over by Schamerhorn. Although plaintiff's vehicle inspection was overdue, Schamerhorn did not issue her a ticket, but again let her go with a warning, and she had her vehicle inspected shortly afterwards. Tr. at 68-70. Plaintiff also omits any mention of this traffic stop in her complaint or affidavit,

however, stating that "[f]or several months between October 2004 and June of 2007, Sgt. Schamerhorn did not approach me." Dkt. #39-2 ¶ 14; Dkt. #23 ¶ 31.

Plaintiff's next encounter with Schamerhorn is what led to this lawsuit. Plaintiff testified that on the evening of June 20, 2007, she went out for dinner and drinks with some girlfriends. After midnight, plaintiff was driving her car, intending to drop off one of her friends at the friend's house in Greece, when Schamerhorn pulled her over. Plaintiff admitted at her deposition that she was speeding at that time, Tr. at 75, and that she had failed to stay in her lane, apparently because she had either missed a turn or nearly took the wrong turn. Tr. at 73, 76.

For purposes of the present motions, the ensuing events need not be recited in great detail, but in short, Schamerhorn walked up to plaintiff's car window, asked her some questions, and directed her to get out of the car, which she initially refused to do. After several other officers arrived on the scene, plaintiff did step out of the car, and was given a field sobriety test. She was then arrested for driving while intoxicated. Plaintiff alleges that during the course of the arrest, Schamerhorn was "slammed against the police vehicle and placed in handcuffs," and that Schamerhorn placed his hands on her breasts and inner thighs, and pressed his body into her backside. Dkt. #23 ¶ 44. Plaintiff was taken into custody, and was eventually convicted at trial of speeding and of driving while intoxicated. Tr. at 112-13.[2]

Based on the events of June 21, 2007, plaintiff has asserted the following claims: (1) a Fourth Amendment excessive-force claim against Schamerhorn; (2) a Fourteenth Amendment equal protection claim against the Town and Schamerhorn; (3) a claim against the Town based on its alleged failure to properly train and supervise Schamerhorn, and to investigate prior complaints against him; (4) a claim against the Town based on its "ratification" of Schamerhorn's conduct; and

---

[2]Plaintiff also testified that Schamerhorn gave her a ticket in July 2008 for having an expired registration. Tr. at 182-83.

(5) a claim against the Town for "condoning" Schamerhorn's conduct. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.[3]

The Town has moved for summary judgment dismissing the four claims asserted against the Town. Schamerhorn has joined in that motion as it relates to the equal protection claim. Schamerhorn has not moved as to the excessive-force claim.

## DISCUSSION

### I. Failure to Train and Similar Claims Against the Town

"There is no *respondeat superior* liability under § 1983." *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996). Rather, to succeed on a claim against a municipality, the plaintiff must show that "the alleged unlawful action [was] implemented or was executed pursuant to a governmental policy or custom." *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). In *Monell*, the Supreme Court established that local governments are "persons" within the meaning of § 1983, and thus may be sued under that statute, but only when the injury in question was caused by the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. 436 U.S. at 694.

Cases decided after *Monell* "have considerably broadened the concept of official municipal action," however. *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) (Sotomayor, C.J.). Not only does the term "official policy" encompass more than just "formal rules or understandings," *id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)), but the policy need not itself be unconstitutional. "Where a city's official policy is constitutional, but

---

[3]As originally pleaded, the amended complaint (Dkt. #23) also asserted claims against former Greece Chief of Police Merritt Rahn, and an additional § 1983 claim against Schamerhorn based on his alleged assault of plaintiff. Pursuant to a stipulation (Dkt. #38), plaintiff has withdrawn all of her claims against Rahn, as well as the assault claim against Schamerhorn.

the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts." *Amnesty America*, 361 F.3d at 125. The Court of Appeals in *Amnesty America* went on to explain that "[s]uch circumstances may be found, for example, where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force." 361 F.3d at 125-26 (citations omitted).

A municipality may also be held liable for a constitutional deprivation caused by a lower-level employee's single tortious act if the plaintiff can show that the municipality "ordered or ratified" that act. *Id.* at 126. Ratification of a subordinate's acts can be demonstrated by showing that municipal policymakers explicitly approved of the act, or by showing that a "policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them ... ." *Id.* "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference to a constitutional violation may be demonstrated through "proof of a policymaker's failure to respond to repeated complaints of civil rights violations ... ." *Id.* at 128 (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). *See, e.g., Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) (reversing judgment as a matter of law in favor of city, where evidence showed that four excessive-force complaints had been filed against officer during the three years prior to plaintiff's arrest, evidencing a pattern of abusive behavior by the officer, and internal investigations of those complaints resulted in no discipline against the officer, despite findings that the allegations of at least one of the complainants were "believable"); *Jackson v. City of Pittsburgh*, 688 F.Supp.2d 379, 398-99 (W.D.Pa. 2010) (plaintiff presented jury question as to whether city was

deliberately indifferent to the need to train its police officers and that this failure was the actual cause of plaintiff's injuries, where evidence showed that city was aware of five prior complaints against officer for use of excessive force, but did nothing to attempt to rectify his conduct). To defeat summary judgment, however, plaintiffs' evidence must establish "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' *Vann*, 72 F.3d at 1049, and [that] the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Amnesty America*, 361 F.3d at 128.

A municipality can also be liable for failing to train its employees "where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Id.* at 129. To hold a municipality liable under this theory, a plaintiff must not only establish "that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference," but also "identify a specific deficiency in the [municipality]'s training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Id.* (quoting *City of Canton*, 489 U.S. at 391). In other words, the plaintiff "must establish that 'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* at 129-30 (quoting *City of Canton*, 489 U.S. at 390-91). *See also Reynolds*, 506 F.3d at 192 ("a city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need") (citing *City of Canton*, 489 U.S. at 390).

Here, though plaintiff frames her claims of municipal liability in several different ways–failure to train and supervise, ratification, and condoning Schamerhorn's conduct–all of these claims rest upon her assertion that the Town had been put on notice of Schamerhorn's prior

misconduct involving traffic stops of women, including prior incidents involving plaintiff, and that the Town did not take adequate steps to curb that behavior.

In support of that assertion, plaintiff relies partly on a prior complaint and lawsuit filed in this Court by one Elia Visconte in 2001. In that lawsuit, which was filed against the Town of Greece, Schamerhorn, and several other defendants, the plaintiff, Visconte, alleged that during a June 1, 2000 traffic stop, Schamerhorn falsely arrested her, and that he used excessive force against her in the course of that arrest.[4]

Shortly after that incident, Visconte filed an administrative complaint with the GPD. The GPD opened an internal affairs investigation in mid-June, and at the same time, reassigned Schamerhorn from road patrol to a desk job.

The Town filed disciplinary charges against SCHAMERHORN in October 2000, and following a hearing, the town supervisor issued a written reprimand, finding that Schamerhorn had violated several GPD rules and regulations during the traffic stop of Visconte. The reprimand letter further stated that any future similar occurrences would lead to additional discipline, possibly including termination. Schamerhorn's job reassignment remained in effect.

Schamerhorn's union then filed a grievance on his behalf, challenging the Town's disciplinary actions. After a hearing, an arbitrator issued a decision in July 2002 sustaining the grievance in part and denying it in part. The arbitrator found that the Town had just cause to issue its January 2001 reprimand, and that while the Town acted properly in initially reassigning Schamerhorn from road patrol to an administrative position, it acted arbitrarily and capriciously when it made that reassignment permanent. The arbitrator directed Schamerhorn to undergo sensitivity training and a refresher course in the proper use of handcuffs and the proper conduct of

---

[4]The facts relating to the Visconte matter are taken in part from an arbitration decision concerning a grievance filed by Schamerhorn against the Town. A copy of that decision has been submitted by the Town, *see* Dkt. #33-4, and the underlying facts as recited by the arbitrator do not appear to be disputed by the parties here.

traffic stops, after the successful conclusion of which Schamerhorn was to be returned to road patrol. Dkt. #33-4 at 26.[5]

In the meantime, Visconte filed her civil rights lawsuit in July 2001. The case was settled and dismissed in June 2004.

In addition to Visconte's complaint, plaintiff also alleges that she and her father complained to the GPD several times about Schamerhorn's behavior toward her. In particular, plaintiff testified at her deposition that the day after the October 24, 2004 incident in which Schamerhorn allegedly kicked her feet out from under her and forcefully handcuffed her, she called her father and told him what had happened, and he called the GPD. She testified that the person her father spoke to told him that plaintiff could come in to the police station and file a written complaint, and that she did so the following day. Tr. at 58-59.

Plaintiff testified that the day after she spoke to her father, *i.e.*, two days after the incident with Schamerhorn, she went to the GPD station on Fetzner Road in Greece, filled out a complaint form, and turned it in. Tr. at 59, 133-34. She further testified that she "put in the complaint that [she] had felt that Sergeant Schamerhorn had used excessive force," and that she "listed the injuries that [she] had," including bruises and blood blisters on her back and wrists. Tr. at 61. When asked if she had "ma[d]e a copy of [the complaint] for [her]self," plaintiff testified that she did not. Tr. at 60.

Plaintiff testified that she heard "absolutely nothing" from the GPD in response to her complaint. Tr. at 59. She stated that about a month after she filed the complaint form, her father called the GPD to inquire about the status of the complaint and was told that "they were working on

---

[5]In his decision, the arbitrator stated that had he been applying a "preponderance of the evidence" standard, his decision would have been more favorable to the Town. *See* Dkt. #33-4 at 10. He stated, however, that he was bound to apply a "clear and convincing evidence" standard, and that because neither Visconte's nor Schamerhorn's testimony was entirely credible, the matter "basically came down to a case of *she said-he said*," *id.* at 22 (emphasis in original). The arbitrator concluded that Schamerhorn did use unnecessary force against Visconte, but that the Town had not proved by clear and convincing evidence that he should be permanently taken off road patrol duty.

it." Tr. at 60. Plaintiff stated that she made no more inquiries about the complaint because her then-attorney advised her against it since there were no other witnesses to the incident and therefore "there was nothing [she] could do." Tr. at 61-63.

Plaintiff also testified about one other complaint that her father allegedly made, by telephone, to the GPD prior to the June 2007 incident. She stated that when she got home immediately after the Summer 2004 incident in which SCHAMERHORN pulled her over for allegedly running a red light, she called her father and told him what had happened and how "obnoxious" Schamerhorn had been. Tr. at 23. She testified that he called the GPD that night and again the following day. Tr. at 26. She did not know to whom he spoke, but she stated that her father complained "[t]hat the officer was obnoxious and ... wouldn't tell [plaintiff] ... why he pulled [her] over." Tr. at 26.[6] She testified that her father was told that "if [plaintiff] wanted to file a valid complaint ..., [she] had to go in and fill out some paperwork," but that she "didn't [file a complaint] that time." Tr. at 27.[7]

In support of her contention that the Town had knowledge of Schamerhorn's propensity to engage in the type of behavior alleged in this case, plaintiff relies, then, on Visconte's complaint and lawsuit, plaintiff's July 2004 written complaint, and her father's alleged complaints to the GPD. Although the complaint also alleges, upon information and belief, that "Sgt. Schamerhorn was the subject of 13 separate complaints filed by 13 separate women earlier in his career that involved him engaging in virtually identical conduct to the facts alleged herein," Dkt. #23 ¶ 15, plaintiff has since abandoned that allegation. At oral argument, plaintiff's attorney indicated that this allegation was

---

[6]Apparently plaintiff meant that Schamerhorn did not immediately tell her why he had pulled her over, since she clearly stated that he did at some point tell her that he had pulled her over for going through a red light. Tr. at 22-23.

[7]Plaintiff also testified that neither she nor her father complained to the GPD in connection with the traffic stop later that summer in which Schamerhorn pulled plaintiff over and let her go with a warning for having an expired registration. Tr. at 31.

In addition, plaintiff testified that Schamerhorn pulled her over in the spring of 2007, and again gave her a warning, this time for having an overdue inspection sticker. Plaintiff stated that neither she nor her father made any complaint about that traffic stop. Tr. at 69-70.

based on "a news media article," but that discovery had failed to turn up any prior complaints against Schamerhorn other than those involving plaintiff and Visconte.

Visconte's complaint cannot, in itself, supply a basis for *Monell* liability in this case, because the Town *did* take action in response to that complaint. The Town took Schamerhorn off road patrol, filed disciplinary charges against him, and issued a reprimand. Only after an arbitrator ruled partly in Schamerhorn's favor and directed the Town to return him to road patrol duty did the Town do so. *See Rogers v. City of Little Rock*, 152 F.3d 790, 799 (8th Cir. 1998) (undisputed evidence that police department investigated prior incidents involving police officer and suspended him based on that investigation was sufficient as a matter of law to defeat a claim that the city responded inadequately to information about officer's prior misconduct); *Williams v. City Of Detroit*, No. 07-14858, 2009 WL 3059150, at *5-*6 (E.D.Mich. Sept. 24, 2009) (since city "did not turn a blind eye to the [prior] complaint" involving certain officer, but "immediately commenced an internal investigation," plaintiff could not show a basis for city's liability for officer's actions; even if city's response to complaint were "negligent or reckless, that single instance" did not show "that the City was deliberately indifferent in its investigation").

As stated, plaintiff also alleges that her father complained to the GPD on two occasions prior to the June 2007 incident: once following Schamerhorn's stop of plaintiff in the summer of 2004, and again following the incident in October 2004.[8] The complaint also alleges that plaintiff's father "complained to Sgt. Schamerhorn's supervisor for over two hours about the amount of unnecessary and degrading force that Plaintiff was subject to during her arrest by Sgt. Schamerhorn" during the October 2004 incident. *Id.* ¶ 29.

_____

[8]Plaintiff testified with respect to the summer 2004 stop, that her father called the GPD the night of the stop and again the following day. Tr. at 26. He also allegedly called the GPD about a month after plaintiff filed a written complaint in October 2004 to "see if they did anything about the complaint." Tr. at 60. In total, then, according to plaintiff's testimony, her father made four telephone calls to the GPD relating to Schamerhorn, prior to the June 2007 incident, in connection with two incidents.

The chief problem with these allegations, however, is that plaintiff has not come forward with any admissible evidence to support them. Plaintiff has alleged, and testified, that her father called the GPD to complain, but those allegations are based on what her father allegedly told plaintiff he had done. That is inadmissible hearsay, and plaintiff has submitted no affidavit or other proof from her father.[9]

In opposing a motion for summary judgment, a party must present *admissible* evidence demonstrating the existence of a genuine issue of material fact, *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); hearsay evidence will not suffice. *See, e.g.*, *Lawrence v. Mehlman*, 389 Fed.Appx. 54, 56 n.2 (2d Cir. 2010); *Mason v. Correctional Med. Services, Inc.*, 559 F.3d 880, 885 (8th Cir. 2009); *Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003). While there is some authority that hearsay may be considered on a motion for summary judgment, upon a showing that admissible evidence will be available at trial, *see Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985), plaintiff has presented nothing to suggest that her father would be available to testify at trial, much less that he would testify consistent with plaintiff's deposition testimony about his alleged complaints to the GPD. The only evidence before the Court at this point concerning plaintiff's father's alleged complaints is plaintiff's own hearsay testimony. That is not admissible evidence and may not be used to defeat the Town's motion for summary judgment. *See Herr v. Airborne Freight Corp.*, 130 F.3d 359, 361 n.4 (8th Cir. 1997) ("As Herr has not shown that the shop steward would be available as a trial witness, she may not rely on [the shop steward's] statement in opposing summary judgment").

_____

[9]I also note that at her deposition, plaintiff had some difficulty remembering when her father made some of these alleged complaints. At one point, she testified that her father and her father-in-law separately went to a GPD station to complain about Schamerhorn's treatment of her in the summer of 2004. Tr. at 137-40. She did, however, state that she was "not sure what timeline" those complaints were made, Tr. at 135, and later in her deposition she stated that she "misspoke" about when those complaints were made, and that in fact they were made in July 2008, after she had again been pulled over by Schamerhorn and issued a citation for driving an unregistered vehicle. Tr. at 187.

That leaves plaintiff's alleged written complaint in October 2004. Oddly, plaintiff does not reference this alleged complaint either in her complaint in this action or in her response to the Town's motion for summary judgment, nor has she referenced it in her response to the Town's interrogatories, *see* Dkt. #33-3 at 2. In her response to the Town's Rule 56 statement of undisputed facts, plaintiff states with respect to this incident only that her "father complained to Sgt. Schamerhorn's supervisor for over two hours" about what had happened.[10]

Even assuming that plaintiff did file a written complaint in October 2004, however, I find that this is insufficient to give rise to a genuine issue of material fact as to whether the Town had a custom, policy or practice that was a proximate cause of the constitutional violation alleged here.

As stated, plaintiff has advanced several theories of why the Town should be held liable for Schamerhorn's alleged conduct, some of which overlap each other: failure to train, failure to supervise, failure to investigate prior complaints, ratification of Schamerhorn's conduct, and condoning that conduct. I see no basis for a finding that the Town "ratified" Schamerhorn's conduct

---

[10]In its Rule 56 statement, the Town asserts that "[n]o prior incident of alleged police misconduct of Schamerhorn – other than the claim asserted by complainant, Ms. Elia Visconte – are part of the record of this case ... ." Dkt. #33 ¶ 8. Plaintiff contends, however, that because the Town's Rule 56 statement does not contain citations to admissible evidence, as required by Local Rule 56(a)(3), the Court should essentially ignore the Town's statement, and deem plaintiff's statements in her own Rule 56 statement to be admitted by the Town.

While the local rule does provide that each statement in a movant's Rule 56 statement must include citations to admissible evidence, I decline to follow plaintiff's suggestion in this regard. For one thing, the rule itself does not provide that a movant who submits a noncompliant Rule 56 statement shall be deemed to have admitted the nonmoving party's factual assertions. Rather, the rule provides that the failure to submit a proper Rule 56 statement "may constitute grounds for denial of the motion." Local Rule 56(a)(1).

I do not believe that denial of the Town's motion is warranted on this basis, however. The deficiency in the Town's Rule 56 statement is relatively minor, and the factual record is sufficiently clear for plaintiff to respond to, and for the Court to decide, the Town's motion on the merits. Indeed, plaintiff's substantive response to the motion demonstrates that. To deny the Town's motion based on this procedural irregularity, then, would accomplish little more than delaying the proceedings in this case, by forcing the Town to resubmit its motion in the proper format. While the Court does not wish to encourage noncompliance with the Local Rules, in this instance I believe that all the parties will be better served by the Court's deciding the Town's motion on the merits.

after the fact, however. Such a claim requires a showing that "authorized policymakers approve[d] a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Assuming, *arguendo*, that Schamerhorn did use excessive force against plaintiff, there is no evidence that the Town both knew and approved of his use of excessive force.

Plaintiff's claim against the Town, then, ultimately rests on her allegation that the Town knew of the risk posed by Schamerhorn's continued assignment to road patrol duty, prior to the June 2007 incident, and that the Town failed to take appropriate steps to eliminate or minimize that risk. Plaintiff's alleged written complaint in October 2004 does not support such a finding, however.

Courts have consistently held that sporadic or isolated incidents involving officers will not give rise to municipal liability. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("A single incident normally does not suffice to prove the existence of a municipal custom"); *Rogers*, 152 F.3d at 799 ("a single claim is not enough to raise a genuine issue of fact about whether the city dealt inappropriately with sexual harassment by officers"); *Puch v. Village of Glenwood, Illinois*, No. 05 C 1114, 2008 WL 4442610, at *14 (N.D.Ill. Sept. 25, 2008) ("Generally, an isolated problem with a single officer does not give rise to *Monell* liability").

Rather, a plaintiff must "show that the defendants were on notice of a pattern of constitutional violations," such that the failure to provide further training, or to take other remedial or prophylactic action "was tantamount to a deliberate or conscious decision on the part of the [municipality] to allow the violations" to continue. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). *See also Doe v. Special School Dist. of St. Louis County*, 901 F.2d 642, 646 (8th Cir. 1990) (stating that for a governmental entity to be held liable on the basis of custom, "there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law").

In accordance with those principles, the Second Circuit has stated that "[t]o prove ... deliberate indifference" to constitutional violations, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious," and that "[a]n obvious

need may be demonstrated through proof of *repeated* complaints of civil rights violations" that were "followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049 (citing *City of Canton*, 489 U.S. at 390) (emphasis added).

While the Second Circuit did not state that an obvious need for better supervision can *only be* shown through proof of repeated complaints, clearly it will be a rare case in which a single prior incident suffices to hold a municipality liable. *See Palagonia v. Sachem Cent. School Dist.*, No. CV 08-0791, 2012 WL 1391917, at *9 (E.D.N.Y. Feb. 14, 2012) ("'allegations of a single, isolated, incident of [municipal] misconduct will not suffice' for purposes of demonstrating the existence of a municipal policy") (quoting *Aguilera v. County of Nassau*, 425 F.Supp.2d 320, 324 (E.D.N.Y. 2006)).

The Second Circuit's decision in *Amnesty America* provides an example of the kinds of circumstances that will, and will not, give rise to municipal liability. In that case, the Court of Appeals held that the plaintiffs, who had been arrested during an anti-abortion demonstration, had presented sufficient evidence for a factfinder to conclude that the defendant town was liable for failing to supervise its police officers, where there was evidence that the town's chief of police (who was a policymaker for the town) not only witnessed, but may have encouraged, the officers' brutal conduct toward the plaintiffs, and that the officers' conduct was "so blatantly unconstitutional that [the chief]'s inaction could be the result of deliberate indifference to the protesters' constitutional rights." 361 F.3d at 128.

The court also held, however, that the plaintiffs had not adduced sufficient evidence to support their failure-to-train claim. To establish such a claim, the court explained, the plaintiffs needed to "identify a specific deficiency in the [town]'s training program and establish that that deficiency [wa]s 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Id.* at 129 (quoting *City of Canton*, 489 U.S. at 391). Since the plaintiffs in *Amnesty America* had "proffered no evidence of the Town's training programs or advanced any theory as to how a training deficiency caused the police officers to use excessive force" against them,

the court held that the district court properly granted summary judgment for the town on that claim. The mere fact that excessive force had allegedly been used on two separate occasions, the court added, was not enough to show both that the officers had been improperly trained and that this training caused them to use excessive force. *Id.* at 130-31.

Plaintiff, then, must show that Schamerhorn's allegedly unconstitutional conduct resulted, at least in part, from the Town's knowing exercise of a deliberate choice. Though "[t]he means of establishing deliberate indifference [to a subordinate's constitutional violations] will vary given the facts of the case," in the end "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Id.* at 128 (quoting *City of Canton*, 489 U.S. at 389).

Plaintiff's evidence in this case does not support a finding that the Town made a "conscious choice" to ignore Schamerhorn's constitutional violations. Viewing the evidence in the light most favorable to plaintiff, that evidence shows that Visconte filed an administrative complaint and a lawsuit against the Town, in connection with an incident that occurred in 2001, and that the Town took swift action in response to that complaint. Some three years later, plaintiff–according to her deposition testimony, if not her complaint or affidavit–submitted a written complaint about Schamerhorn at the GPD station on Fetzner Road, and she essentially heard no more about that complaint. Nearly three years after filing that complaint, the incident giving rise to this lawsuit occurred.

Again, assuming the truth of plaintiff's testimony that she filed a written complaint in October 2004, that is a far cry from the circumstances that courts have found demonstrate an "obvious" need for better or more stringent training or supervision. *Cf. Amnesty America*, 361 F.3d at 128 (plaintiffs "proffered ample evidence from which a reasonable factfinder could conclude that the necessity for more supervision of officers at anti-abortion protests was "glaringly obvious," and that police chief ignored the alleged constitutional violations, where plaintiffs' affidavits, if credited, established that at both demonstrations, police officers "inflicted severe pain on arrestees and made

- 15 -

comments suggesting that they intended to inflict pain," that violence "permeated the entire arrest scene," and that "continuous screams of pain punctuated the demonstrations"); *Vann*, 72 F.3d at 1042 (finding a basis for *Monell* liability where city failed to monitor the actions of a particular officer who "had been the subject of numerous complaints, lodged by both colleagues and civilians; ... had been disciplined several times, psychologically evaluated, and placed on restricted duty; and [who] had been returned to active duty, following which he was involved in several additional incidents"); *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996) (finding sufficient evidence for a reasonable jury to infer that city policy chief knew or should have known of officer's violent behavior, based on "a series of actual written civilian complaints of similar nature, ... containing specific information pertaining to the use of excessive force and verbal abuse" by the officer, but each of which, under the city's "sterile and shallow ... system of investigation, ... was insulated from other prior and similar complaints and treated in a vacuum," with the result that none of the complaints was sustained, and the officer was never disciplined).

That plaintiff's October 2004 complaint concerned the same officer who was involved in the Visconte incident might suggest that plaintiff's complaint should have been given closer attention by the GPD. But plaintiff has not presented *any* evidence of what became of her complaint, other than her testimony that she heard nothing more about it, and her hearsay testimony that her father told her that he called the GPD some time after plaintiff filed the complaint and was told by some unidentified person at the GPD that "they were working on it." That may show negligence on the part of some individuals within the GPD, but it is not enough to support a finding that the Town made a "conscious decision" to ignore plaintiff's complaint. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997) (plaintiff seeking to establish municipal liability "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice"); *Jones v. Town of East Haven*, ___ F.3d ___, 2012 WL 3104523, at *7 (2d Cir. Aug. 1, 2012) (stating that "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action,'" and that "demonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent") (quoting *Brown*, 520 U.A. at 410). *Cf. Beck*, 89 F.3d at 973 (noting that prior citizen complaints "had been transmitted through the police department chain of command to the Chief of Police," thus demonstrating that "he had knowledge of the complaints").

The passage of time here between these successive complaints, and between the underlying incidents themselves, is also worth noting. The Visconte incident occurred in 2001. Manville's prior written administrative complaint was allegedly filed in October 2004, and the events giving rise to this lawsuit occurred in June 2007. By plaintiff's own admission, "[f]or several months [thirty-two months, to be exact] between October 2004 and June of 2007, Sgt. Schamerhorn did not approach Plaintiff," Amended Complaint ¶ 31, and plaintiff has proffered no evidence that the GPD received any complaints about Schamerhorn during that time.

Thus, there were two prior complaints concerning Schamerhorn, roughly three years apart, the second of which was made over two and half years prior to the incident giving rise to this action. *Cf. Beck*, 89 F.3d at 973 (noting that most of the prior citizen complaints about officer in question were made "in a narrow period of time"). The GPD responded to the first of those complaints, in 2001, imposing discipline that was severe enough that an arbitrator later ordered the penalty to be reduced. The arbitrator also opined that, with proper remedial training, Schamerhorn's future behavior and attitudes could be modified, such that Schamerhorn would be unlikely to engage in similar misconduct in the future. *See* Dkt. #33-4 at 22-24. Schamerhorn did undergo further training.

Against that background, the failure to take action on plaintiff's October 2004 complaint (even assuming that the blame for such failure could be laid at the feet of the Town's policymakers, though there is no evidence before me to support such a finding) does not evince the kind of deliberate disregard of an obvious risk that would support a finding of *Monell* liability. That is all the more true considering the length of time that passed, apparently without incident, between that

October 2004 complaint and the events underlying this suit. Given that extended period of quiescence, it is difficult to see how the Town's alleged failure to act in 2004 could constitute deliberate indifference that was both "substantially certain to result" in a constitutional violation, *City of Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) (quoted in *Jones*, ___ F.3d at ___, 2012 WL 3104523, at *7), and which "actually caused or was the moving force behind the alleged violation[]" in 2007. *Reynolds*, 506 F.3d at 193 (citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)). *See also City of Canton*, 489 U.S. at 391 (stating that "the identified deficiency ... must be closely related to the ultimate injury"); *Puch*, 2008 WL 4442610, at *14 (evidence of a single prior citizen complaint against police officer, twenty-one months before the incident involving the plaintiffs, could not support claim that the officer posed such a known danger to the community that failure to monitor his actions constituted deliberate indifference on the part of the village).

I conclude, then, that there is no basis for a claim against the Town based on any theory of deliberate indifference. Whether the claim is framed in terms of a failure to train or to supervise, or based on the Town's alleged ratification or condoning of Schamerhorn's actions, the evidence does not support a finding that the Town had actual or constructive knowledge of an actual or potential constitutional violation, and that the Town, acting through its policymaking officials, consciously chose to ignore that violation or that obvious risk. Plaintiff's third, fourth and fifth causes of action must therefore be dismissed.

## II. Equal Protection

In her second cause of action, plaintiff alleges that the Town and Schamerhorn violated her right to equal protection under the law. The amended complaint alleges that defendants "discriminated against the Plaintiff as members [sic] of an identifiable class and/or 'class of one,' and that the discrimination was intentional." Dkt. #23 ¶ 55. Plaintiff further alleges that defendants "failed to enforce the laws and rules of the state of New York which pertain to harassment, assault,

and battery against women," and that "they treated the Plaintiff's complaints of harassment differently from other types of harassment ... ." *Id.*[11]

At oral argument, plaintiff's counsel agreed with the Court's characterization of this claim, insofar as it is asserted against the Town, as a claim that the Town "discriminates against women who are arrested by road patrol officers." In support of that assertion, counsel cited an incident involving another Greece police officer, Gary Pignato. In 2004, Pignato, the Town, and the GPD were sued by Deborah Jenny (who was represented by the same attorney as Manville in this case), who alleged that on November 21, 2003, Pignato had arrested her without probable cause, for allegedly running a stop sign, and that he used excessive force against her. Jenny's claims against the Town were based on her allegation that the Town knew of Pignato's propensity "to abuse and misuse his power and authority as a police officer" based on prior incidents as well as Pignato's previous termination from the Rochester Police Department due to misconduct. *See Jenny v. Town of Greece*, 04-CV-6182, Dkt. #1 ¶ 58. Jenny's § 1983 case was dismissed pursuant to a stipulation of the parties in August 2004.[12]

---

[11]Plaintiff also makes the rather puzzling allegation that defendants "took no action to locate or arrest harassing members of their community," *id.* This allegation, which appears to have no relevance to the facts of this case, may be attributable to counsel's "'copy and paste' document preparation method," which this Court has commented on before. *See Sullivan v. Chappius*, 711 F.Supp.2d 279, 285 (W.D.N.Y. 2010).

[12]At oral argument in this action, there was some discussion of other alleged, mostly sexual, misconduct by Pignato, which has been the subject of various civil and criminal proceedings in state court. Plaintiff does not cite those incidents in the complaint, however, nor does she appear to rely on them in support of her claim.

Given plaintiff's apparent nonreliance on those other incidents involving Pignato, and the complete absence of any admissible evidence concerning them, it is unnecessary for the Court to consider those incidents. Though they therefore play no role in the Courts' decision, I do note, however, that it appears that those events mostly occurred after the June 2007 incident involving plaintiff, and that they were factually dissimilar from the events giving rise to the case at bar. *See* "Merritt Rahn Guilty on Seven Counts," Rochester Democrat and Chronicle, Apr. 30, 2010 (available on Lexis); "Former Cop Pignato Reaches Plea Deal," Rochester Democrat and Chronicle, Mar. 2, 2010 (available on Lexis).

There is no evidence before me, however, that the Town failed to adequately respond to Jenny's complaint, or that the Town's action or inaction in response to that complaint evinced a policy on the part of the Town to tolerate unequal treatment of female citizens by its police officers. While the allegations here may have been enough to survive a motion to dismiss, then, they are not enough to demonstrate a genuine issue of material fact, so as to survive a motion for summary judgment.

In opposing the Town's motion, plaintiff must do more than simply rely on the allegations of her complaint; she must come forward with evidence from which a rational jury could find in her favor. *See Murphy v. Board of Educ. of Rochester City School Dist.*, 273 F.Supp.2d 292, 299 (W.D.N.Y. 2003), *aff'd*, 106 Fed.Appx. 746 (2d Cir. 2004). Plaintiff has not, however, adduced facts showing that the Town had a policy of permitting its police officers to use excessive force against female citizens, or otherwise to treat them differently from males. Although a single incident may, under some circumstances, be enough to show the existence of a municipal policy, *see Amnesty America*, 361 F.3d at 126-27, the mere fact that an incident occurred, without more, is not enough to make such a showing. *See Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) ("A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy"). *See also Warner v. City of New York*, No. 12-CV-2799, 2012 WL 2501070, at *1-*2 (E.D.N.Y. June 27, 2012) ("A single incident described in a complaint, particularly one that involves actors below the policymaking level, does not raise an inference of the existence of a policy or custom").

Although this claim must therefore be dismissed as to the Town, I conclude that it can proceed against Schamerhorn. The evidence in support of this claim is thin, but viewing the record in the light most favorable to plaintiff, the Court concludes that she has demonstrated the existence of a genuine issue of fact concerning whether Schamerhorn treated her differently on account of her sex.

"To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that [s]he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). A bare assertion that plaintiff was treated differently on account of her sex, without proof of dissimilar treatment, is not enough. *See*, *e.g.*, *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *9 (E.D.N.Y. Mar. 29, 2012) (dismissing equal protection claim where plaintiff alleged only that defendants' actions were taken because plaintiff "is of a minority race," with no allegations of disparity in treatment between plaintiff and another person, or any facts related to plaintiff's race, beyond his identification of himself as a member of a minority); *Bristol v. Queens County*, No. CV 09-5544, 2011 WL 6937468, at *4 n.5 (E.D.N.Y. Feb. 28, 2011) ("bare allegation" of equal protection violation was insufficient to allow claim to proceed, where plaintiff failed to allege any purposeful discrimination directed at an identifiable or suspect class), *Report and Recommendation adopted*, 2012 WL 10484 (E.D.N.Y. Jan. 3, 2012).

In her affidavit in opposition to defendants' motions, plaintiff alleges that at the time of her arrest by Schamerhorn in June 2007, she was

> slammed against the police vehicle and placed in handcuffs while Sgt. Schamerhorn placed his hands on [plaintiff's] bare breasts and fondled them, and placed his hands on [her] inner thighs, all the while, pressing himself into [her] buttocks, with an erection, while pressing [her] against his car.

Dkt. #39-2 ¶ 27.[13]

Depending on the proof at trial, a jury might well conclude that Schamerhorn simply conducted an ordinary pat-frisk of plaintiff, and that he did nothing improper. On a motion for summary judgment, however, the Court cannot draw such inferences or reach such factual conclusions. The Court must view the record in the light most favorable to plaintiff, and if a jury were to credit plaintiff's testimony in this regard, the jury could conclude that Schamerhorn treated

---

[13]Plaintiff's reference to her "bare breasts" is apparently based on her allegation that she was wearing a "low cut shirt." *See* Tr. at 93.

plaintiff differently from other arrestees on account of her sex. *See, e.g.*, *Fall v. Indiana Univ. Bd. of Trustees*, 33 F.Supp.2d 729, 742 (N.D.Ill. 1998) (upholding jury's award of punitive damages for plaintiff on her equal protection claim against former university chancellor, based on plaintiff's testimony that chancellor grabbed her, forcibly kissed her, forced his hand down her blouse, and fondled her breast).

Plaintiff's cursory allegation that she was discriminated against as a "class of one" is meritless, however. To succeed on a class-of-one claim, plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 2970 (2011). Plaintiff "does not describe any way in which [s]he was singled out by the defendants, or identify other similarly-situated individuals who were treated differently." *Robinson v. County of Yates*, 821 F.Supp.2d 564, 570 (W.D.N.Y. 2011). This claim must therefore be dismissed in its entirety.

## CONCLUSION

The Town of Greece's motion for summary judgment (Dkt. #33) is granted. Defendant Thomas Schamerhorn's motion for partial summary judgment (Dkt. #28) is denied.

Plaintiff's third, fourth and fifth causes of action are hereby dismissed in their entirety. Plaintiff's second cause of action is dismissed as to the Town of Greece.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      September 24, 2012.